UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| ANTENNA AUDIO, INC.,<br>383 Main Avenue,<br>Norwalk, Connecticut 06851,<br><br>   Plaintiff,<br><br> v.<br><br>LURAY CAVERNS CORP.,<br>970 U.S. Highway 211,<br>West Luray, Virginia 22835,<br><br>   Defendant. | Civil Action No._____ |

### COMPLAINT

Plaintiff Antenna Audio, Inc., through its undersigned counsel, brings this Complaint against Luray Caverns Corporation and alleges as follows:

### INTRODUCTION

1. By this action, Antenna Audio, Inc. ("AAI") seeks to recover more than $500,000 in damages arising from Luray Caverns Corporation's ("LCC") material breach of the terms of the Audio Tour Contract ("Contract") that governed its relationship with AAI. Specifically, LCC improperly terminated the Contract and refused to remit to AAI payments due thereunder. The Contract is attached hereto and made a part hereof as Exhibit A.

## PARTIES

2.  AAI is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 383 Main Avenue, Norwalk, Connecticut.

3.  LCC is a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business at 970 U.S. Highway 211, West Luray, Virginia.

## JURISDICTION AND VENUE

4.  This Court has jurisdiction over this action pursuant to Article III, §2 of the United States Constitution and 28 USC § 1332(a) (1) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.  Venue is proper in the Western District of Virginia pursuant to 28 U.S.C. § 1391(b) because LCC resides in the Western District of Virginia.

## CHOICE OF LAW

6.  By its terms, the Contract is to be interpreted in accordance with and subject to the laws of the State of California without regard to conflicts of laws principles.

## FACTUAL BACKGROUND

7.  AAI is the world leader in the development, production and implementation of interpretive audio tours for museums, exhibitions, historic sites, and other visitor attractions. Each year over sixty million visitors at more than 1,000 sites around the world participate in tours created, produced and equipped by AAI and its affiliates. The tours create an interesting and interactive experience for visitors while conveying the themes and stories AAI's clients want to share with their customers.

8. Sites that currently utilize tours and equipment developed by AAI and its affiliates include Stonehenge, the Vatican, the Louvre, Ellis Island, Graceland, Golden Gate National Parks Conservancy, Alcatraz, the Guggenheim Museum, the Metropolitan Museum of Art and the Pacific Historic Parks.

9. AAI conducted the first pilot of a handheld multimedia tour in 2001 and its tours have continued to evolve with rapidly changing advances in technology. AAI tours currently utilize portable digital players, MP3 players, audio players, radio transmission systems, or portable multimedia players including the "X-plorer Player" ("Player").

10. On September 28, 2008, LCC joined the ranks of AAI's many clients by executing the Contract with a five-year term.

11. LCC operates a tourist attraction in western Virginia (the "Site"). The Site includes a series of underground caverns, a car museum, a folk-life museum, a bell tower and a garden maze. At the time the parties executed the Contract, LCC utilized only tours guided by staff members.

12. Pursuant to the Contract, the five-year term commenced on the "Opening Date," March 1, 2009, and ended on March 1, 2014. Each party had the right to terminate the Contract if the other party failed to cure a material breach within twenty working days after receiving written notification of the breach.

13. In accordance with its obligations under the Contract, AAI developed and produced audio tours in multiple languages for LCC.

14. In addition, AAI supplied equipment to enable LCC's visitors to listen to the tours, including the Group Tour System which enabled visitor groups to experience the audio tour together under the guidance of a single group leader or tour guide.

15. For visitors who were not part of guided group tours, AAI supplied LCC with Players. The Players enabled individual visitors to tour the LCC at their own pace and play selected audio tracks that corresponded to points of interest on the site.

16. Pursuant to Section 11(c) of the Contract, AAI explicitly disclaimed all representations and warranties with respect to the equipment and services, including any warranties of merchantability and fitness for a particular purpose.

17. The demand for the audio tour equipment at the Site fluctuated with seasonal variations in visitor attendance. Pursuant to the terms of the Contract, AAI agreed to use "commercially reasonable efforts to provide sufficient X-plorer Players and associated Equipment in good working order to meet Visitor Demand." As required by the terms of the Contract, AAI used its discretion to increase or decrease the level of equipment at the Site to meet reasonably anticipated visitor demand.

18. In exchange for AAI's services, LCC was required to pay AAI a minimum annual sum of $200,000. LCC paid AAI $.50 for each person that visited the Site. The per-person fees were calculated on a monthly basis and paid to AAI within thirty calendar days of the end of the month in which the income was generated. At the end of the year, the monthly fees were totaled. If the aggregate of the monthly fees paid to AAI was less than $200,000, LCC was required to submit an additional payment "making up the difference between the Minimum Annual Payment and the amount already paid by the [LCC]" during the year.

19. As part of the agreement, LCC appointed Michael Stillwell ("Stillwell") as its "Operations Liaison" to serve as the single point of contact between AAI and LCC. Stillwell was responsible for the day-to-day operations of the audio tour and equipment at the site.

20. In addition, LCC agreed to dedicate sufficient trained and competent personnel to manage and operate the Audio Tour sales and distribution.

21. LCC further agreed to "store and use the Equipment in a careful and proper manner in accordance to AAI's reasonable instructions."

22. AAI personnel trained Stillwell and others on the LCC staff on the use and maintenance of the AAI equipment, including the Players. During the training, AAI impressed upon the LCC staff the importance of properly using and maintaining the Players, including following a strict pattern of equipment rotation. AAI explained that improper rotation may lead to incomplete battery charging, permanent battery damage and premature failure of the Player itself.

23. AAI also advised LCC on numerous occasions that the Players were intended to be used only with headphones and not as "wands" with the audio played through the external speaker.

24. AAI further made clear that, as part of the proper maintenance of the equipment, LCC should frequently take stock of its inventory and, on a regular basis, return damaged Players to AAI for repair. AAI recommended that LCC return damaged equipment once a week or before the number of damaged units exceeded twenty-five.

25. Once the training was complete, AAI no longer had any operational responsibilities at the Site. AAI did, however, designate Franklin Johnson ("Johnson") as its Washington, D.C. based technician "to ensure that any malfunctions regarding the Equipment [were] cured within a reasonable time period." Johnson was located in Fort Washington, Maryland, a suburb of Washington, D.C.

26. LCC began operating the audio tours in March 2009.

3323640-v2

27. During the course of the audio tours, Players would sometimes suffer damage. LCC shipped the damaged Players to Fort Washington, Maryland for the required repairs. Once Johnson completed the repairs, he shipped the Players back to LCC.

28. With the Audio Tours underway, it quickly became clear that the LCC staff was either overwhelmed or unwilling to ensure the proper use and maintenance of the equipment.

29. LCC insisted in utilizing the Players improperly. For example, LCC permitted visitors to use the external speakers on the Players. The improper use damaged the external speakers. Even though the Players were intended for use only with headphones, LCC repeatedly sent Players to Johnson for repairs to the external speakers and demanded that all Players have operable internal speakers.

30. The LCC staff also failed to keep track of the equipment inventory. Monthly inventory reports sent to AAI were often late and incorrect. On at least one occasion, Stillwell found a box of fifty working Players that had not been integrated into the equipment rotation. Stillwell was not aware the Players had been delivered and were available for the equipment rotation.

31. LCC's inability to track equipment inventory impeded its ability to rotate and charge the equipment in a proper manner, causing damage to the batteries and accelerating the wear on the Players.

32. The lack of inventory control also hindered LCC's ability to identify damaged Players and ship them in a timely manner to AAI for repair. At times, LCC waited as long as a month to ship Players for repair. The delays resulted in the return of damaged Players in groups larger than twenty-five and delayed the repairs.

33. In 2010, Stillwell requested a more rapid turn-around for equipment repairs.

3323640-v2

34. In response, AAI offered LCC the option of shipping damaged equipment directly to AAI's California facility. The California facility maintained stocks of working Players which could be shipped as replacements once the damaged Players were received. Typically, the replacement Players shipped from the California facility the same day the damaged Players were received from LLC.

35. This process provided quicker turn-around than sending the Players to Johnson, having him repair the Players and then shipping the repaired Players back to LCC.

36. LCC did not raise any objection to AAI's proposal and began sending damaged Players directly to AAI's California facilities.

37. Although LCC began shipping equipment directly to AAI's California facility, Johnson remained involved with the LCC account, including performing Site visits and repairing equipment on the Site.

38. In May 2011, only weeks before Memorial Day weekend, LCC demanded that AAI increase LCC's inventory of Players from 1,500 to 2,000 for the upcoming holiday.

39. Although the inventory increase was not supported by historical Memorial Day attendance at the Site, AAI sent an additional 300 Players, increasing LCC's inventory to 1,800 Players for Memorial Day weekend. Soon thereafter, AAI further increased LCC's inventory to 2,000, the level requested by LCC.

40. Following Memorial Day weekend, AAI contacted LCC several times in an attempt to determine how the Memorial Day weekend went.

41. On June 22, 2011, LCC finally responded by stating that "[a]fter Antenna Audio was unable to provide [LCC] with the prearranged number of 2,000 players for Memorial Day weekend, [LCC] made the executive decision…to operate under a guided tour procedure instead

of using the audio tour." Although AAI had increased the Player inventory to ninety percent of the level requested, LCC claimed it made its decision "to avoid prolonged waiting times due to a lack of players to distribute."

42.     LCC also expressed concerns regarding damaged Players and asked AAI to "recommend some other type of equipment to replace the [Players]." AAI responded by offering to replace all of the Players in LCC's inventory with an alternate model player. To that end, AAI sent the alternate player to LCC for review.

43.     Over the next seven weeks, LCC continued to send visitor statistics to AAI. LCC did not communicate any additional dissatisfaction with AAI's equipment or services during that time.

44.     On August 15, 2011, Luray Caverns sent AAI a Notice of Default ("Notice"). The Notice alleged that AAI was in default for "its failure to comply with its maintenance, repair and replacement obligations of the Equipment set forth in the Contract."

45.     The Notice also specifically, and incorrectly, claimed that AAI had not designated a technician based in Washington, D.C. for the LCC account.

46.     The Notice further explained that, prior to Memorial Day, LCC decided to suspend use of the Audio Tour and reinstate its guided tours because it did not have enough Players for Memorial Day weekend.

47.     LCC also utilized the Notice to reject AAI's offer to replace LCC's inventory of Players with an alternate player. This was LCC's first and only response to AAI's offer.

48.     During the next month, AAI tried to engage LCC in discussions to determine what specific actions LCC required AAI to take to address the purported deficiencies in performance. LCC refused to identify the specific actions needed to cure the alleged breaches.

49. Instead, LCC refused to respond to AAI's efforts to resolve the perceived deficiencies in performance until September 14, 2011 – the day before LCC believed the twenty–day cure period expired. Even if LCC's response had delineated what actions LCC wanted AAI to take, the timing of the response ensured that AAI could not reasonably undertake any effort to cure the purported breaches within the twenty-day cure period.

50. AAI continued its efforts to repair the relationship but, as AAI was beginning to understand, LCC had no inclination to engage in efforts to salvage the parties' agreement.

51. On September 27, 2011, counsel for LCC sent formal notice that LCC was terminating the Contract.

52. At all times, AAI has remained ready, willing and able to perform its duties under the Contract. In the end, AAI had no choice but to demand payment for amounts due and owing prior to the illicit termination as well as for lost revenue for the remaining term of the Contract.

53. LCC refused to make any payment for either past due amounts or amounts due during the remainder of the Contract term.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**

54. This is a claim by AAI against LCC for breach of contract.

55. AAI realleges and incorporates herein the allegations set forth in paragraphs 1 through 54, above.

56. At all relevant times, the Contract governed the relationship between the parties and is a valid and enforceable contract.

57. LCC materially breached the Contract by (i) refusing to pay AAI for services rendered prior to termination of the Contract; (ii) prematurely and illicitly terminating the

-9-

Contract; and (iii) refusing to remit payment for the term of the Contract remaining after termination.

58. As a direct result of LCC's material breaches of the Contract, AAI has suffered damages in an amount to be proven at trial and in excess of $500,000.

## SECOND CLAIM FOR RELIEF
### (Breach of the Covenant of Good Faith and Fair Dealing)

59. This is a claim by AAI against LCC for breach of the covenant of good faith and fair dealing.

60. Plaintiff realleges and incorporates herein the allegations set forth in paragraphs 1 through 59, above.

61. The parties' relationship was governed by a Contract that contained an implied covenant of good faith and fair dealing.

62. Pursuant to their covenant of good faith and fair dealing, LCC was obligated to perform its duties and exercise its discretionary authority vis – a – vis AAI in good faith.

63. By its actions as alleged herein, including its refusal to provide AAI a meaningful opportunity to cure the alleged deficiencies in performance, LCC failed to perform in good faith the obligations imposed upon it by the Contract.

64. By its actions as alleged herein, LCC prevented AAI from obtaining the full benefit of performance of the Contract.

65. As a direct result of LCC's material breach of the covenant of good faith and fair dealing, AAI has suffered damages in excess of in excess of $500,000, to be proven at trial.

## PRAYER FOR RELIEF

AAI respectfully requests that this Court:

A. Enter judgment in its favor in an amount to be proven at trial, but for an amount not less than $500,000;

B. Award AAI pre-judgment and post-judgment interest on all amounts;

C. Award Plaintiff such further relief as this Court deems just and proper.

Dated:  August 10, 2012                                                  Respectfully submitted,

/s/
J. Douglas Baldridge (Bar No. 34327)
Vincent E. Verrocchio (Bar No. 40246)
VENABLE LLP
575 7th Street, NW
Washington, DC  20004
Telephone:  202-344-4703
Facsimile:  202-344-8300
jdbaldridge@venable.com
veverrocchio@venable.com

Attorneys for Plaintiff